**Tereso Talmantes JUAREZ, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 56674.

Court of Criminal Appeals of Texas, Panel No. 3.

Sept. 19, 1979.

Bill Alexander, Odessa, for appellant.

Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

OPINION

CLINTON, Judge.

From an assessment of punishment of fifty years confinement for delivery of heroin, appellant presents six grounds of error. We need to consider only one ground, however, since it is dispositive of this appeal.

Ground of error two is:

"The district court erred in admitting into evidence the money seized under a search warrant which was procured from the magistrate through purposive (sic) misrepresentations in violation of appellant's rights under the Fourth Amendment to the Constitution of the United States and Article I, Sections 9 and 10 of the Texas Constitution."

The money referred to is $250.00 in currency, whose denominations and serial numbers were recorded by peace officers who then gave the money to one Danny Matta. Matta was at the time acting as a "cooperating individual" to make a case against appellant for delivery of heroin. Some two weeks earlier Matta had been arrested and charged with four counts of delivery of heroin to an undercover agent; his wife was also arrested and charged with one count. In an effort to "alleviate a little of the pressure of the situation that he was in," as one witness put it, Matta initiated, negotiated and entered into a plea bargain with the district attorney that in consideration of certain actions to be taken and recommendations to be made by the prosecutor he, for his part, would make a buy of heroin from appellant.

In September 1976, appellant resided in Barstow, Ward County, Texas. Matta resided in Pecos, Reeves County, Texas, as did Wendell Taylor, then an investigator for the district attorney for the 143rd Judicial District. The undercover agent was Gary Steven Howard, also then a district attorney investigator for the 143rd Judicial District who was then staying at one or another motel in Pecos. Howard was Matta's "control" agent. Matta had known appellant for about five years and had worked on the same job with him. The plan devised was that Matta would contact appellant at

his home in Barstow and try to arrange a purchase of heroin—all the while Taylor would have the residence of appellant under surveillance from the vantage point of a nearby mobile home and Matta would be in the company of Howard and other officers at a nearby location where Matta and his Mustang automobile would be searched thoroughly and he would be given the $250.00 in currency just before he went to call on appellant.

The operation began Saturday, September 18, 1976 when, according to his supplemental report, Taylor set up surveillance at about noon that day. Matta "believed" that he called at the home of appellant on Saturday and Sunday—the supplemental report does not show that he did—but it is clear that he went by appellant's home on at least four occasions on Monday, September 20, beginning about 9:30 a. m. At some point during the day, Matta reported to Howard that he could make a buy for $250.00. The money was obtained and, af-

ter at least one abortive meeting on a county road during the afternoon, at about 8:00 p. m. Matta drove to the residence of appellant and, according to him, appellant drove up in his pick up; each got out of their respective vehicles, stood and talked for a few minutes and Matta exchanged $250.00 for 65 "nickel papers" of heroin in a plastic wrapper, known in the vernacular as a "ball." Matta then returned in his automobile to the location of Howard and others where he handed over the ball and, as instructed, drove back home to Pecos.

Meanwhile, Taylor had broken off surveillance from the mobile home shortly after he discovered that his radio ceased to function; he obtained a ride to his home in Pecos and then returned to Barstow in his own automobile, but did not arrive until after Matta had returned to Howard—notwithstanding, his supplementary report states that at 8:50 p. m. "Danny Matta returned to Juarez' home." [1]

1. The first trial in this case resulted in a mistrial being declared by the court after Taylor, responding to a question by the prosecutor as to whether, based on a search warrant, he found any heroin in the *house*, answered not in the house and then gratuitously added "on the premises, we did." During his earlier testimony in the first trial he testified as to the comings and goings of appellant that he observed:

> "The next time he left was at 8:50, right after 8:50 when Danny Matta pulled up in front of his house. When Danny drove off, Tito drove off behind him. I'd say 8:55 or something."

And then in describing the occasions when Matta appeared at the residence he also represented that Matta came back at about 8:50 p. m., stayed approximately 5 minutes, did not go in the house but talked to appellant and related the following testimony:

"Q: Where they were standing if you could see them when they had their conversation, any conversation they might have had?

A: The pick up was standing in front of the house, and Danny drove up in front of the house, and they were between the car and the pick up.

Q: And did you ever lose visual contact of Danny Matta and Tereso T. Juarez after Danny drove up to the house?

A: No, I didn't.

\* \* \* \* \* \*

Q: And what . . . could you observe that Juarez and Matta were doing while

they were standing there in front of the Juarez' house together?

A: They talked there like I said for a minute or two, and then it looked like there was some kind of exchange was going on, but I couldn't actually see what did happen.

\* \* \* \* \* \*

Q: And then after their conversation was apparently over, what happened then?

A: Danny got into the car and went ahead and turned and went north.

\* \* \* \* \* \*

Q: What did Tereso T. Juarez, Jr. do?

A: He went and got in the pick up and went north.

\* \* \* \* \* \*

Q: How far did you observe him?

A: When I saw him leave, then I turned around and was on the radio trying to talk to the officers to tell them that Danny had left . . .

Q: And now while you were there at this location under surveillance, when you began the surveillance, did your have you car or vehicle there?

A: No, I didn't.

\* \* \* \* \* \*

Q: How were you picked up, or how did you get away from your surveillance after you observed Danny Matta and Tereso T. Juarez leave the Juarez' residence?

A: I called my compadres to pick me up when they could.

Q: Who came and picked you up?

It will be recalled that Investigator Howard and the officers accompanying him were at a location where they could not observe appellant's house or near approaches to it. Thus, when Matta returned to that location the last time he was the only person in the state's group who knew what he had actually done during the 15 minutes or so that he was out of the sight of every officer. Howard testified that when Matta handed him the ball a search of his person demonstrated that Matta did not still have the $250.00 in currency with him but, as Howard also admitted, "At that point I couldn't, it would be impossible for me to say what happened to it."

The problem thus confronting Howard and his associates became obvious: Unless they could prove that the $250.00 in currency was possessed by appellant either on his person or in his house, the case they had been working so hard to make against appellant was weak indeed, resting as it did primarily upon the testimony of the ubiquitous Danny Matta.

During a pre-trial proceeding before the second trial, in his argument to the court the district attorney pinpointed what was generally believed to be true at that time:

"And, as far as trying to get the search warrant for money, of course, that would be evidentiary and couldn't do it anyway. But certainly if you have a search warrant for heroin, and you discover some stolen property or what have you, you can certainly pick it up during the search for the heroin."

A: Mr. Halliburton.
  *  *  *  *  *  *
Q: What did you do then?
A: I went and got my car.
Q: Where was your car located?
A: Pecos."

At the second trial Taylor was questioned adversely on voir dire in reference to the search warrant question when the following occurred:

"Q: Alright, your records showed that the original delivery of heroin was observed by you about 8:30, is that correct?
A: I believe that's right.
Q: It showed that at nine o'clock the heroin was given to the DEA and the other officers by Danny Matta, the informant . . is that correct?
A: That record I put said eight fifty.

Accordingly, a search warrant was obtained, as Taylor conceded at one point, "To find any contraband that we could find plus the marked money." The warrant was issued late Monday night or early Tuesday morning,[2] upon an affidavit reading in pertinent part:

"On this day Danny Matta purchased a narcotic drug, to-wit: Heroin in the suspected place and the money for the purchase was supplied to Danny Matta by the undersigned and further that Affiant has had the suspected place under surveillance for the past 48 hours and has seen heavy traffic at said location including known and suspected drug users and dealers.

Further affiant says that the informant, Danny Matta, told the affiant that the suspected party was keeping and possessing a quantity of heroin inside of the said suspected residence. That Danny Matta told the affiant as an junderlying (sic) circumstance supporting this conclusion that informant has been inside of said residence within the past twenty-four hours and has observed the said suspected party keeping and possessing heroin.

That the affiany (sic) has known the informant, Danny Matta, for a number of years. That during this period of time the informant, Danny Matta, has given the affiant information on more than one occasion about violations of the Texas

Q. Alright.
MR. HOLCOMBE: Excuse me . . . we've got to interject here. I was not involved in this situation, and I was not going to put this evidence on in the case in chief, but I discovered it different in the meantime, and I'm going to ask Mr. Taylor right now to tell you that is not correct. He did not see a transfer. He not there at 8:50.
WENDELL TAYLOR: That's correct.

2. In his ground of error V appellant contends that the date of the warrant and the jurat to the affidavit were "misdated," since he views the evidence as nearly conclusive that they were done on the 21st rather than the 20th. In view of our disposition in this case, however, we need not and do not address that matter.

Controlled Substance Act. That the affiant has always checked this information supplied by the informant and has proved it to be true and correct. That the informant has also supplied the affiant with the information that has allowed the affiant to arrest individuals for violations of the Texas Controlled Substance Act. That the affiant . . . ran the surveillance described above, beginning September 18, 1976."

From the first pre-trial through the mistrial, the second pre-trial and during the second trial, appellant stoutly challenged the validity of the search warrant and the underlying affidavit on nearly every conceivable basis, particularly attacking the veracity of many statements in the affidavit. All motions and objections were overruled but, as indicated in the footnote in the margin below,[3] the trial court permitted appellant to perfect a full bill even though at one point the district attorney, noting his own effort to be patient, expressed the thought that "we are going beyond the search warrant" rather than "to look at the warrant on its face." When he completed his bill of exceptions appellant reurged and renewed all his objections which the trial court overruled.

Of course, all of these proceedings predated *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) in which the Supreme Court held that the "four corners" rule in Delaware impinged on Fourth Amendment protections in precluding every

challenge to veracity of sworn statements in an affidavit for search warrant. This Court has recently applied the holding of *Franks v. Delaware* retroactively to an affidavit for search warrant executed in June 1976, *Ramsey v. State*, 579 S.W.2d 920 (Tex. Cr.App.1979), and, because the trial court there did not hold an evidentiary hearing on allegations that the affidavit contained a falsehood, reversed the conviction and remanded the cause. In the case before us now, however, exhaustive hearings were held at the pre-trial stage as well as on bill of exceptions during the course of the trial, and the trial court ruled implicitly in accordance with the law as it then existed that the sufficiency of a statement of probable cause in an affidavit for a search warrant is determined from the four corners of the affidavit.

With *Franks v. Delaware*, however, the rule to be followed and the test to be applied are:

". . . where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at the hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of

---

**3.** A different judge presided over the second pre-trial and trial. At the beginning of the second pre-trial appellant reurged all previous motions but the judge understandably announced that the court would affirm all decisions and rulings made at the first pre-trial. However, the court made it clear to appellant that he had the right "to go into anything in any of your motions that you have pending here at this time." Accordingly, among others, appellant presented a second motion to suppress and was permitted to examine and interrogate adversely Taylor as affiant to the affidavit for search warrant. After argument the court overruled the motion but stated that the motion would certainly be reconsidered as the trial progressed in the event evidence became supportive. Thereafter, when the testimony of Investigator Howard reached the point of exe-

cution of the search warrant the jury was excused and the proposed testimony of Howard was heard by the court; when it reached the point of recovering $250.00 in currency, appellant made a lengthy objection that included "for the reason that the affiant has testified that the facts given to the magistrate in the affidavit are not necessarily the facts that he says in the affidavit." After hearing the argument the court overruled the motion and objection "in all respects" but permitted a continuing running exception and also allowed appellant at that point to make his bill of exception by further interrogating Investigator Howard, the magistrate that issued the warrant and Affiant Taylor. Having completed his bill appellant then reurged all of his objections and the court "respectfully overrules all your motions" with a continuing running exception.

the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

Accordingly, the hearings having been held and the allegations overruled, we examine the record to determine whether the *Franks v. Delaware* test was met.

First, we note that in the affidavit "suspected place" or "suspected residence" refers to a dwelling house in charge of and controlled by appellant. The first statement in the probable cause portion of the affidavit is one of direct fact, without attribution to any other source: "On this day Danny Matta purchased a narcotic drug, to-wit: Heroin in the suspected place .   ." That statement, as already demonstrated, is patently false on at least two points: First, Taylor, having recanted his earlier testimony about being on surveillance and observing the alleged transaction at 8:50 p. m., did not have the personal knowledge to make the factual statement. Secondly, the only evidence as to the situs of the purchase came from Danny Matta, himself, and he said it occurred in front of the residence as they stood by and between their respective motor vehicles.

The second factual statement in the first sentence of the affidavit, again without attribution to any source, is "the money for the purchase was supplied to Danny Matta by the undersigned .   .   ." Investigator Howard testified on the bill of exception:

"Q: Who gave the money, the $250.00 that you are prepared to testify that you discovered in the house, who gave that money to Danny Matta?

A: I did.

Q: If Officer Taylor swore to the magistrate that he, that the money for the purchase was supplied to Danny Matta by the undersigned, did you see him give that money to Danny Matta?

A: Mr. Taylor did not give the money to Danny Matta."

The third statement in the first sentence is also a personal report by Taylor of his surveillance during which he claims to have seen "heavy traffic at said location including known and suspected drug users and dealers." Since his supplemental report of comings and goings did not identify anyone other than appellant, his brother and Matta, Taylor was asked to give the names of "suspected drug dealers and users," and, after naming one, he admitted he couldn't "call names" because he did not recognize them, and then retreated to the following position:

"Q: Now, it's your testimony then that you just saw other people coming and going?

A: I just said 'suspected,' too. That's all I said.

Q: Everybody that went in that house, of course, then was suspected?

A: Yes, sir."

The next paragraph in the probable cause portion of the affidavit claims that Danny Matta "told the affiant that said suspected party was keeping and possessing a quantity of heroin inside of the said suspected residence" and that the circumstance supporting "this conclusion" is that Danny Matta said he "has been inside of the said residence within the past twenty-four hours and has observed the said suspected party keeping and possessing heroin." As to this, affiant Taylor himself testified:

"Q: Did Danny Matta tell you that that he had been in that house prior to the 24–hour period that preceded the arrest or the warrant?

A: I don't know whether he told me, but between all the Officers we discussed it.

Q: You swore on your oath that Danny Matta told you that he had been in that house in that 24–hour period. Now, my question to you is: Did he tell you that, or did he not tell you that? Or do you know?

A: Sir, I couldn't be for sure he told me personally."

Matta testified:

"Q: Did you tell Officer Taylor that at any time prior to the time that you alleged he gave the stuff to you, that you had seen him in possession of any heroin, either out there on the road, out there around the road, or in the house?

A: I don't remember telling him that I had seen him in possession. I knew that he had . . .

\* \* \* \* \* \*

Q: And you never did see any heroin in this house, did you?

A: No sir, I didn't.

\* \* \* \* \* \*

Q: . . . Did you ever tell anybody that you had seen that day, either Saturday or Sunday or Monday, any heroin in Tito Juarez' and Gloria Juarez' house?

A: No, sir, I didn't.

Q: And if Officer Taylor says that you told him, that you had seen Teto Juarez keeping and possessing heroin, this was not you that told him, is that true?

A: He may have misunderstood what I said.

Q: But you didn't tell him that, did you?

A: I said that . . .

Q: Excuse me . . . you didn't tell him that on Saturday or Sunday or Monday you had seen possession by this man of heroin in this house that we are talking about . . .

A: I don't recall having said so, no."

The last paragraph in the probable cause portion of the affidavit reports that Taylor had known Matta for a number of years and asserts that Matta had given him information about violations of the Controlled Substances Act which had been checked and proved to be true and correct and had permitted Taylor to arrest individuals for violation. This material, of course, goes to the credibility of Matta rather than the veracity of affiant Taylor. Whether one may believe Matta becomes completely irrelevant when it is shown clearly, as here, that the first paragraph is represented as a direct statement of facts from the affiant that are blatantly false, and the second paragraph that does report statements allegedly made by Matta are false in that they were never made.

We find, therefore, that appellant has established by a preponderance of the evidence that false statements knowingly and intentionally, or with reckless disregard for the truth, were included by affiant in the warrant affidavit. When we set aside, as we must, the first two paragraphs of the probable cause section all that remains are the assertions of Matta's credibility that are completely insufficient to establish probable cause. We conclude, therefore, that the search warrant must be voided and the fruits of the search excluded.

The judgment of conviction is reversed and the cause remanded.